# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| IPEG, INC., | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Civil Action No. 11-574 |
|  | ) | Judge Nora Barry Fischer |
| HAMILTON AVTEC, INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION

Pending before the Court is Plaintiff/Counterclaim-Defendant IPEG's Motion to Dismiss Counterclaim Count II for Intentional Interference with Contractual Relationships, (Docket No. [18]), raised by Defendant/Counterclaim-Plaintiff Hamilton Avtec, Inc. ("Hamilton") in its Answer, Affirmative Defenses and Counterclaim. (Docket No. 14). The Court has considered IPEG's brief in support of its motion to dismiss, (Docket No. 19), Hamilton's brief in opposition, (Docket No. 24), and IPEG's reply. (Docket No. 25). The motion has been fully briefed and is ripe for disposition. For the following reasons, the motion [18] will be GRANTED.

**I. Factual Background**

IPEG, d/b/a Conair ("IPEG") brings this action for breach of contract and declaratory judgment. (Docket No. 13 at ¶ 1). IPEG is a Delaware corporation with its principal place of business in Pennsylvania. (*Id.* at ¶ 3). IPEG claims that Hamilton is a Canadian corporation with its principal place of business in Ontario, Canada. (*Id.* at ¶ 4). Hamilton denies that it is a Canadian corporation, but admits that its principal place of business is in Ontario. (Docket No. 14 at ¶ 4). Hamilton states that it is organized under the laws of Ontario. (*Id.* at ¶ 76).

1

IPEG claims that this Court has subject matter jurisdiction over the parties because they are of diverse citizenship and the amount in controversy exceeds $75,000. (Docket No. 13 at ¶ 5). IPEG also states that this Court has personal jurisdiction over Hamilton pursuant to Pennsylvania's long-arm statute, 42 Pa.C.S.A. § 5301, *et seq.*, due to Hamilton's business transactions in Pennsylvania. (*Id.* at ¶ 6).

IPEG is a privately-owned manufacturing and industrial service company that provides high-end equipment, parts, and turnkey services in the plastics manufacturing industry. (*Id.* at ¶ 8). At various times, IPEG has had a relationship with Hamilton for the commissioned sale of IPEG equipment and parts pursuant to a territorial representative agreement or through Hamilton's purchase and independent distribution of IPEG's equipment and parts. (*Id.* at ¶ 11). This "off-and-on" relationship began in the late 1960s. (Docket No. 14 at ¶ 11).

### a. The Alleged Representative Agreements

On September 15, 2007 (the "First Representative Agreement") and March 10, 2010 (the "Second Representative Agreement"), IPEG and Hamilton entered into two separate agreements (the "Representative Agreements"), wherein Hamilton was designated as IPEG's exclusive sales representative in the Canada (the "Territory") subject to certain exceptions. (Docket No. 13 at ¶ 12-13). According to IPEG, these agreements provide the method by which commissions would be calculated and paid to Hamilton for sales made within the Territory. (Docket No. 13 at ¶ 15). Hamilton was entitled to 25% of sales made outside the Territory, but for which the ultimate destination was within the territory. (*Id.* at ¶ 16).

The Representative Agreements included a termination provision. This provision provided that, in the event that either party wished to terminate the agreement, that party would inform the other of its reasons and the parties would engage in a 90-day good faith effort to

resolve the issue. (*Id.* at ¶ 18). However, the Representative Agreements provided that they could be terminated with or without cause on 30 days written notice. (*Id.* at ¶ 19). The Second Representative Agreement also gave IPEG the right to terminate the Agreement upon breach of *any* agreement by Hamilton. (*Id.* at ¶ 20). The Second Representative Agreement "will be governed by the laws of the Commonwealth of Pennsylvania." (*Id.* at ¶ 21).

### b. The Alleged Distribution Agreements

The parties also allegedly entered into several distribution agreements (the "Distribution Agreements"). (*Id.* at ¶ 22). These agreements were dated August 16, 2008 (the "First Distribution Agreement") and February 11, 2010 (the "Second Distribution Agreement"). Both agreements expressly stated that the Representative Agreements would govern the relationship between IPEG and Hamilton, save as expressly provided in the Distribution Agreements. (*Id.* at ¶ 25).

The Distribution Agreements also granted Hamilton the right to purchase equipment and spare parts from IPEG to resell "for its own account" to customers within the Territory. (*Id.* at ¶ 26). Such sales were to be FOB IPEG, reduced in price, and payable net 60 days from invoice for equipment and net 30 days from invoice for spare parts. (*Id.* at ¶ 27).

### c. The Disputes

In December 2010, IPEG sought to terminate the agreements due to Hamilton's failure to achieve sufficient market penetration or to meet its obligations under the Second Representative Agreement. (*Id.* at ¶ 29). IPEG claims that Hamilton failed to provide a sufficient sales staff to serve the Territory. (*Id.* at ¶ 30). IPEG also claims that Hamilton was distributing competing products and that, due to this conflict, Hamilton was not meeting its obligations under the Agreements. (*Id.* at ¶ 34).

In a letter dated January 28, 2011, IPEG proposed that Hamilton be terminated as sales representative, but that it continue as a distributor. (*Id.* at ¶ 36). Hamilton rejected this proposal in February 2011, but requested a continuing dialogue. (*Id.* at ¶ 37). IPEG then noted that the 90-day resolution period ended on March 17 and the 30-day termination period ended on April 16, 2011.

On April 5, 2011, Hamilton acknowledged the initiation of the termination process and raised several issues. (*Id.* at ¶ 38). These issues included commissions payable for multi-territory sales, returns of IPEG's warranty items, and outstanding inventory of IPEG products held by Hamilton. (*Id.*). It was at this time that Hamilton asserted that the disputes gave rise to a claim of breach of contract by IPEG, and that Hamilton would not pay on its accounts payable to IPEG until all the issues were resolved. (*Id.* at 39). Based on these disputes, IPEG claims to have calculated the commission due to Hamilton from IPEG and invoices due to IPEG from Hamilton. (*Id.* at 41). IPEG claims that the net amount payable to IPEG is $227,104.55. (*Id.* at ¶ 42).

### d. Hamilton's Counterclaim Allegations

In many respects, the counterclaim's factual pleadings mirror the pleadings in IPEG's Amended Complaint. However, certain allegations differ markedly from IPEG's pleadings.

First, Hamilton claims that, on January 6, 2011, an IPEG representative "stated that he considered Hamilton to be a competitor, and that [Hamilton] did not fit into [the representative's future plans for Conair." (Docket No. 14 at ¶ 94). Hamilton also claims that IPEG entered negotiations with a new sales agency and collaborated to solicit certain of Hamilton's sales agents for employment. (*Id.* at ¶ 97).

Additionally, Hamilton claims that it learned that IPEG had been, and was continuing to, circumvent Hamilton by engaging in a significant amount of direct sales to Hamilton's

customers within the Territory. (*Id.* at ¶ 102). Through this circumvention, Hamilton claims, IPEG has deprived Hamilton of its contractual commissions. (*Id.* at ¶¶103-104). Moreover, this circumvention interfered with Hamilton's contracts with its customers. (*Id.* at ¶ 118).

### e. The Parties' Claims

IPEG claims that Hamilton has breached the Distribution Agreements. (*Id.* at ¶¶ 48-53). These breaches have resulted in net damages to IPEG of $269,930.69. (*Id.* at ¶ 52). IPEG also seeks a declaratory judgment that it has not breached any of the Agreements. (*Id.* at ¶¶ 54-64).

In its Answer, (Docket No. 14), Hamilton raises several Affirmative Defenses. Hamilton claims that IPEG has failed to state a claim upon which relief can be granted, that IPEG is barred by the terms and conditions of its Agreements, that the claims are barred by IPEG's breach of the Agreements, that IPEG has failed to comply with conditions precedent to Hamilton's alleged contractual duties, that the claims are barred by IPEG's attempts to unilaterally modify the agreements, that Hamilton acted in good faith and in accordance with the terms and conditions of the Agreements, that IPEG's claims are barred by the doctrine of unclean hands and its bad faith conduct, that the claims are estopped, that the doctrines of setoff and/or recoupment bar the claims, and that IPEG failed to mitigate its damages. (Docket No. 14 at ¶¶ 65-74). Hamilton also reserved its right to assert additional defenses made relevant during or through discovery. (*Id.* at ¶ 75).

Hamilton then raised several counterclaims. Specifically, Hamilton asserts that *it* is entitled to damages for breach of contract. (*Id.* at ¶¶ 109-116). It also claims that it is entitled to damages based on IPEG's interference with Hamilton's contractual relations. In this regard, Hamilton avers that it has several valid contracts with other customers. (*Id.* at ¶ 118). Hamilton maintains that IPEG was aware of these contractual relationships and that it intentionally

5

interfered with Hamilton's relationships. (*Id.* at ¶¶ 117-125). Hamilton also claims that it has a right to an equitable accounting of IPEG's sales. (*Id.* at ¶¶126-132).

### f. The Parties' Arguments on the Motion to Dismiss

IPEG states that Pennsylvania's "gist of the action" doctrine bars Count II of the counterclaim – intentional interference with contractual relations. (Docket No. 19 at 4). It argues that the "gist of the action" doctrine separates breach of contract and tort claims. (*Id.*). According to IPEG, because the counterclaim is essentially nothing more than a breach of contract claim recast as a tort claim, the "gist of the action" doctrine bars the claim. (*Id.* at 5-6).

Hamilton responds that the "gist of the action" doctrine does not bar its counterclaim because it has made allegations of purely tortious actions pertaining to parties *outside* of IPEG's contracts with Hamilton. (*See* Docket No. 24 at 2). Moreover, Hamilton claims that its tortious interference claim is independent of its breach of contract claim. (*Id.* at 4).

## II. Legal Standards

"Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a complaint." *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F.Supp.2d 520, 524 (W.D.Pa. 2011) (citing *United States v. Union Gas Co.*, 743 F.Supp. 1144, 1150 (E.D.Pa. 1990)). A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) challenges the legal sufficiency of the complaint filed by a plaintiff. The United States Supreme Court has held that "[a] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555(207) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences

therefrom in favor of the plaintiff. However, as the Supreme Court made clear in *Twombly,* the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* The Supreme Court has subsequently broadened the scope of this requirement, stating that only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

Thus, after *Iqbal,* a district court must conduct a two-part analysis when presented with a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d. Cir.2009). First, the Court must separate the factual and legal elements of the claim. *Id.* Although the Court "must accept all of the complaint's well-pleaded facts as true, [it] may disregard any legal conclusions." *Id.* at 210-211. Second, the Court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to show such an entitlement with its facts." *Id.* at 211 (citing *Iqbal* 129 S.Ct. at 1949). The determination for "plausibility" will be "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 211 (quoting *Iqbal* 129 S.Ct. at 1950).

As a result, "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Id.* at 211. That is, "all civil complaints must now set out sufficient factual matter to show that the claim is facially plausible. This then allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 210 (quoting *Iqbal,* 129 S.Ct. at 1948). However, nothing in *Twombly* or *Iqbal* changed the other pleading standards for a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and the

requirements of Fed.R.Civ.P. 8 must still be met. *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d. Cir.2008). Fed.R.Civ.P. 8 requires a showing, rather than a blanket assertion, of entitlement to relief, and "contemplates the statement of circumstances, occurrences, and events in support of the claim presented and does not authorize a pleader's bare averment that he wants relief and is entitled to it." *Twombly,* 550 U.S. at 555 n. 3; *see also Morse v. Lower Merion School District*, 132 F.3d 902, 906, n. 8 (3d Cir. 1997) (a court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'"). Additionally, the Supreme Court did not abolish the Fed.R.Civ.P. 12(b)(6) requirement that "the facts must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on those merits." *Phillips,* 515 F.3d at 231 (citing *Twombly,* 550 U.S. at 553).

### III. Analysis

The "'gist of the action' doctrine is 'designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] precluding plaintiffs from recasting ordinary breach of contract claims into tort claims.'" *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 229 (3d Cir. 2008) (quoting *eToll Inc. v. Elias/Savion Advertising Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)). The "gist of the action" doctrine operates to bar tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

*First United Bank & Trust v. The PNC Financial Services Group, Inc.*, 667 F.Supp.2d 443, 449 (M.D. Pa. 2009) (citing *Hart v. Arnold*, 884 A.2d 316, 340 (Pa. Super. Ct. 2005)).

The necessary elements to satisfy a claim for interference with contractual relations are: (1) the existence of a contractual relationship between the plaintiff and a third-party; (2)

purposeful action on the part of the defendant intended to harm that existing relationship; (3) absence of privilege or justification on the part of defendant; and (4) actual legal damage as a result of the defendant's conduct. *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. 2003). This type of claim is based on the relationship between the plaintiff and a third party, not the plaintiff and defendant. *Medical Mktg. Consultants, LLC v. Cardiac Telecom Corp.*, Civ. No. 06-274, 2007 WL 1811155, *2 (W.D. Pa. 2007).

Although it appears, on first glance, that these doctrines operate within the same space, a deeper reading makes clear that they do not. The "gist of the action" doctrine operates as a bar to tort claims that arise solely due to the contractual relationship between a plaintiff and defendant. *See First United*, 667 F.Supp.2d at 449. The key to the interference claim is that there is a relationship between the plaintiff and *third-party* with which the defendant interferes. *See Reading Radio*, 833 A.2d at 211.

Here, Hamilton has pled that it has a contractual relationship with third parties. (Docket No. 14 at ¶ 118). It has also alleged that IPEG's actions were undertaken with the intention of diverting funds from Hamilton to IPEG, without legal justification. (*Id.* at ¶¶ 119-122). Hamilton has likewise pled damages as a result of IPEG's actions and requested damages in excess of $75,000. (*See id.* at ¶ 123). It has therefore satisfied three of the four elements of a claim for interference with contractual relations.

The element that gives this Court concern is the "privilege or justification" element. The Court finds relevant the following passage:

> One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor.

9

*Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F.3d 199, 220 (3d Cir. 2009) (quoting Restatement (Second) of Torts § 768 cmt. b (1979)). As Hamilton claims, IPEG's activities were done with the purpose of "diverting funds due to Hamilton to [IPEG]." (Docket No. 14 at ¶ 121). This is the essence of competition and the purpose of the competitive privilege.

This Court finds guidance in *Chemtech International, Inc. v. Chemical Injection Technologies, Inc.*, 170 Fed. App'x 805 (3d Cir. 2006). In *Chemtech*, the Court of Appeals for the Third Circuit addressed a situation virtually identical to the present one: Chemtech had a contract to distribute CIT's products in a specific territory, Southeast Asia. *Id.* at 806. The complaint alleged that CIT was distributing directly to Chemtech's customers and "inducing the [third party customers] to not deal with" Chemtech. *Id.* at 809. The Court of Appeals upheld dismissal of the tortious interference claim, reasoning that:

> Chemtech correctly claims that it has a right to be free from-and CIT has a corresponding duty not to commit-certain kinds of interference in its business dealings. But Chemtech does not have a right to be free from competition and CIT has no duty "imposed by law as a matter of social policy" not to compete with Chemtech. Only a contract can confer such a right and impose such a duty-as it did for these parties…

*Id.*

Given the general privilege to compete, and based on the pleadings, it appears that, to the extent that IPEG might have a duty not to engage in competitive business practices, that duty would only arise under the Agreements. Such a duty would therefore fall under either the "created and grounded in the contract itself" or the "liability stems from a contract" prongs of the "gist of the action" doctrine. *See First United*, 667 F.Supp.2d at 449. The Court therefore finds that the "gist of the action" doctrine serves to bar Hamilton's counterclaim of tortious interference with contractual relations.

**IV. Conclusion**

For the foregoing reasons, Plaintiff IPEG's motion to dismiss [18] Hamilton's tortious interference with contractual relations counterclaim is GRANTED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record

Date: September 13, 2011